# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR No. 19-4 J |
| | ) | |
| STEPHEN K. SHANER | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
### OMNIBUS MOTION TO SUPRESS PHYSICAL EVIDENCE

AND NOW COMES Defendant STEPHEN K. SHANER, by and through his attorney Thomas J. Farrell, Esquire, and files this Memorandum of Law in Support of His Omnibus Pretrial Motion to Suppress Physical Evidence:

### Factual Background

Defendant Stephen K. Shaner ("Shaner") was the sole owner of SKS Associates, Inc. ("SKS"), a medical office located in Johnstown, PA. Two doctors, Michael Cash and Ruth Jones, worked in the office as independent contractors. Their practices at SKS consisted of providing medication assisted treatment ("MAT"), in the form of buprenorphine, to individuals with opioid use disorder ("OUD"). A counselor, Dennis Williamson, also occupied an office in the SKS facility and counseled patients with OUD. Mr. Williamson was employed by Dr. Mary Berge & Associates and maintained his records in the SKS office. SKS, a limited liability company, leased the office space from Joseph Del Signore, Jr. *See* Exhibit F (the lease agreement for the SKS building).

Buprenorphine is a drug that effectively treats OUD.  It is an opioid partial agonist, meaning it binds to the opioid receptors of the brain, like other opioids, but it is weaker and has a "ceiling effect" so that larger doses of the drug do not produce a stronger high after a certain level. Buprenorphine is a Schedule III controlled substance. *See* Exhibit A (the Affidavit of Probable Cause), ¶ 15. When combined with naloxone, buprenorphine is prescribed under the brand names of Suboxone and Zubsolv. *Id*. The naloxone decreases the likelihood of diversion and misuse of suboxone. *Id*. Subutex is the brand name of buprenorphine without naloxone, prescribed to pregnant women or individuals with an allergy to naloxone. *Id*. at ¶ 14.

The Federal Drug Administration approved buprenorphine for clinical use to treat opioid dependence in 2002. *Id*. Congress waived the requirements under 21 U.S.C. § 823(g)(1) for practitioners to dispense and administer Schedule III, IV, and V narcotic drugs for maintenance or detoxification purposes, subject to certain conditions. See, Exhibit A ¶ 11. In order for a practitioner to prescribe these drugs, including buprenorphine, he or she must obtain a waiver pursuant to 21 U.S.C. § 823(g)(2). *Id*. Practitioners who obtain this waiver are known as "DATA-waived" physicians. *Id*. Dr. Michael Cash became a Data-waived physician in approximately 2003. Exhibit A, ¶ 10.

Federal agents conducted an investigation of Dr. Cash and SKS which resulted in a search warrant issued by Magistrate Judge Lenihan on April 9, 2018. Exhibit B (the search warrant for Dr. Cash and SKS). The Affidavit of Probable Cause alleged that in August 2016 the DEA received information from an insurance provider that

Dr. Michael Cash was writing a high number of buprenorphine prescriptions without billing insurance for office visits. Exhibit A, ¶ 19. The DEA commenced an investigation. *Id.* at ¶ 18. Physical and electronic surveillance on SKS' outside parking lot observed patients from March 2017 to May 2017. *Id.* at ¶ 34. The surveillance showed that many patients pulled up to the location and entered the building for office visits that lasted approximately five minutes. *Id.* Approximately 240 patients had office visits during this time period. *Id.*

Three agents posed as individuals suffering from OUD. *Id.* at ¶¶ 23-26. On their first trip each investigator saw Dr. Michael Cash for an initial evaluation before receiving a prescription for Suboxone. *Id.* On every subsequent visit, the investigators communicated with Sue Sanders, a nurse who ran the office's daily business, but did not see Dr. Cash. They filled out a one-page "Therapy Progress Report," gave it to Sanders along with payment, and received a prescription for suboxone without seeing a doctor. *Id.* Each prescription was for identical quantities and dosages. Exhibit A, ¶ 27. The Affidavit of Probable Cause asserts that based on the officers' training and experience there was probable cause to believe Dr. Cash and others prescribed buprenorphine outside the usual course of professional practice. *Id.* at ¶¶ 5,9.

The search warrant includes two attachments which set out the property to be searched (Attachment A) and the Items to be searched for and Seized (Attachment B). See Exhibit B; Exhibit C (Attachment A to the search warrant); Exhibit D (Attachment B to the search warrant). Attachment A lists the SKS office building, located at 2001 Bedford Street, Johnstown, PA 15904, as the property to be searched

3

and references Stephen K. Shaner as the owner of SKS. Exhibit C, ¶ 1.  Dr. Michael

Cash is listed as the DATA-waived physician who prescribes buprenorphine for the

practice. *Id*. The description of the office mentions that there are other businesses

within the establishment; however, it does not describe where those businesses are

or what steps the officers would take to protect the businesses' property. *Id*.

Attachment B describes the items to be seized in broad terms which omit

specific dates, persons or businesses associated with documents, and specific areas

within the building to be searched. Exhibit D. Descriptions within Attachment B

include:

> 1. All business and financial records and information, in
> any form, whether electronic or non-electronic, generated
> and/or maintained in the operation of SKS ASSOCIATES,
> INC. (SKS), to include but not be limited to written and
> emailed correspondence, which evidence violations of Title
> 21 United States Code, Section 841(a)(1) and 841(b)(1)(C),
> 843, and 846 (illegal drug distribution, acquiring a
> controlled substances by forgery or fraud, and conspiracy),
> Title 18, and Section 1956 and 1957 (money laundering and
> conspiracy to launder the proceeds of diversion);
>
> 2. Prescriptions;
>
> 3. All controlled substances;
>
> 4. Patient information, in any form, whether electronic or
> non-electronic, files, records and ledgers reflecting any
> corresponding medical purpose for said prescriptions;
>
> 5. Records and documents, in any form, whether electronic
> or non-electronic relating to the purchase, dispensation,
> administration, prescription or distribution of controlled
> substances required to be maintained pursuant to Title 21,
> C.F.R. Section 1302 et seq.;
> 6. Records and documents, in any form, whether electronic
> or non-electronic, from or related to accounts maintained

4

at domestic and foreign banks and other financial institutions, by SKS, Stephen K. SHANER, Michael CASH, D.O.;

7. Address and/or telephone books, diaries, phone directories, photographs, video tapes, undeveloped film and the contents therein, in any form, rolodex, indices, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers, billing records, in any form, whether electronic or non-electronic, claims, claim forms, office fee slips, cash, and checks reflecting prescriptions, and billings whether electronic or non-electronic.;

…

17. Any computer, computer system and related peripherals (in open view or secreted)' commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs. Data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, computer photographs, graphic interchange formats and or photographs, and other visual depictions of such graphic interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD Flash memory devices, thumb drives, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals, which contain any or all of the above-listed items of evidence.

Exhibit D.

While some of these paragraphs include references to SKS, Shaner, and Dr.

Cash which serve to limit their scope, others include no limitation on which

individual's or businesses' records could be searched or seized. The warrant

5

does not identify particular patient files to be seized, nor any timeframe to limit

the scope of the search; its scope is all files.

On April 11, 2018 federal agents executed the search warrant at the SKS office building. Exhibit E (the search warrant inventory). Officers took over 100 boxes of property from the office without regard to whether the property belonged to SKS, Dr. Cash, Dr. Jones, or other businesses located within the building. *Id*. This property included paper medical records; SKS's computers and all the files on them; and notebooks which included notes from telephone calls, patient information, and a waiting list of individuals who had contacted SKS about receiving treatment. *Id*. The discovery production in this case showed that over 50 boxes of Dr. Cash's active patient files were seized in addition to over 50 boxes of inactive files, as well as all records of Dr. Ruth Jones' patients, even though neither the warrant nor the Affidavit ever mentioned Dr. Jones. This included patient file records, notes, and pre-signed prescriptions.  Further, discovery showed that officers recovered records from Dr. Cash's medical marijuana business, "EM2k." Finally, the officers took Dennis Williamson's files, although this property was eventually returned.

**Argument**

I.   <u>**As sole owner of SKS, Defendant Stephen Shaner had the property right to exclude people from the SKS offices; consequently, he has Fourth Amendment standing to challenge the search.**</u>

The records in this case fall within the basic property protections afforded by the Fourth Amendment. The Fourth Amendment affords an individual the right to be free from unreasonable searches of his "persons, houses papers and effects." U.S.

6

Const. Amend. IV. It has been held that a shareholder or owner of a corporation does not have a reasonable expectation of privacy in files located within the corporation's offices. *See United States v. Nagle*, 803 F.3d 167, 178-179 (3d Cir. 2015). *Nagle*, and the out of circuit cases on which it relies, cite to the shareholder's lack of a reasonable expectation of privacy to reject standing for Fourth Amendment purposes. *See, e.g.*, *Id.* at 178 ("Nagle must show a personal connection to the electronic files located on the server and that he kept them private in order to demonstrate a reasonable expectation of privacy"); *United States v. Mohney*, 949 F.2d 1397, 1403 (6th Cir. 1991) ("the defendant cannot challenge a search as he would not have a reasonable expectation of privacy in such materials); *Williams v. Kunze*, 806 F.2d 594, 599 (5th Cir. 1986) ("unless the shareholder, officer or employee can demonstrate a legitimate and reasonable expectation of privacy in the records seized, he lacks standing to challenge the search and seizure").

However, the Supreme Court has clarified in recent years that the reasonable expectation of privacy test, originally crafted by the Court in *Katz v. United States*, 389 U.S. 347, 360 (1967), is not the sole basis for protection under the Fourth Amendment. Rather, *Katz* adds to the basic property rights protections found in the Fourth Amendment's text. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) The Court in *Jardines* stated:

> The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons,

houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *United States v. Jones*, 565 U.S. [400], [406], n. 3, (2012). By reason of our decision in *Katz v. United States*, 389 U.S. 347, (1967), property rights "are not the sole measure of Fourth Amendment violations," *Soldal v. Cook County*, 506 U.S. 56, 64, (1992)—but though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government does engage in [a] physical intrusion of a constitutionally protected area," *United States v. Knotts*, 460 U.S. 276, 286, (1983) (Brennan, J., concurring in the judgment).

*Id. See also* United *States v. Stanley*, 753 F. 3d 114, 118 (3d Cir. 2014) (Stating that there are two ways in which a government's conduct may constitute a search: unlawful physical intrusion onto private property and violation of an individual's reasonable expectation of privacy).

The Supreme Court has recognized that a business owner has a Fourth Amendment right to limit the entry of administrative searches onto a business' premises. *See v. Seattle*, 387 U.S. 541, 544 (1967). In *See*, the court made an analogy to subpoena cases, which require a subpoena to a business for books and records to be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Id*. The court stated, "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id*. at 543. This case and others like it indicate a business owner may exclude government agents from a business' property.

As the sole owner of SKS, Shaner has the right to exclude individuals from its premises and control over its records. *Id*; Exhibit G, at ¶ 2. *Nagle* and the cases on

which it relies discuss only the reasonable expectation of privacy theory of Fourth Amendment standing. Nowhere in the opinion does *Nagle* address the property rights theory of Fourth Amendment protection that the Supreme Court has revived in *United States v. Jones*, 565 U.S. 400, 407-408 (2012) and *Jardines*, 569 U.S. at 5. Consistent with the revived property rights baseline of the Fourth Amendment and the recognition of the right of a business owner to exclude individuals from property in *See*, 387 U.S. at 544, a business owner such as Mr. Shaner has standing to challenge a physical intrusion by law enforcement onto the business' premises.

**II.** **The search warrant lacks particularity as to the timeframe for which records could be searched, the locations to be searched, and the property that could be seized pursuant to the warrant.**

In order to be sufficient under the Fourth Amendment, a search warrant must state with particularity the persons and places to be searched and seized. Otherwise a warrant gives executing officers no meaningful guidance as to what may or may not be searched and authorizes a general rummaging around of the individual's property, the very evil the Fourth Amendment intended to prevent. *United States v. Yusuf*, 461 F.3d 374, 393 (3d Cir.2006). In this case, the warrant was written so broadly that it allowed officers to indiscriminately seize all documents within the commercial building where SKS was located. The warrant failed to specify sufficient probable cause for all documents not pertaining to Dr. Cash and all documents before the genesis of the investigation. Therefore, these records should be suppressed.

A search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. As to what is to be taken,

9

nothing is left to the discretion of the officer executing the warrant." *United States v. Christine*, 687 F.2d 749, 752–53 (3d Cir.1982). A warrant is general if it "vest[s] the executing officer with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." *United States v. Leveto*, 540 F.3d 200, 211 (3d Cir.2008). In other words, the warrant must ensure that "the magistrate, rather than the officer, determined what was to be seized." *Christine*, 687 F.2d at 753.

A court must look at the particular factual context of the case to determine whether a warrant contains sufficient particularity. *Yusuf*, 461 F.3d at 395. One important factor is the information available to the officers executing the search. *Id*. Further, a warrant must "be no broader than the probable cause on which it is based." *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002).

In *United States v. Wecht*, the Affidavit of Probable Cause alleged that Allegheny County's coroner, who also maintained a private autopsy practice, had misused government personnel and government resources to benefit himself and his family personally and politically. *United States v. Wecht*, 619 F. Supp. 2d 213, 217-218 (W.D. Pa. 2009). The search warrant described the property to be seized as "Boxes (approximately twenty) and contents containing private autopsy files." *Id*. at 226. The court ruled that the warrant in the case lacked sufficient particularity. *Id*. at 235.

The warrant failed to "make clear that the boxes of private autopsy files which the Government wanted to seize were *those which had been removed from the ACCO* [Allegheny County Coroner's Office] as an alleged act of concealment of evidence." *Id*.

at 229 (emphasis in original). Further, "the warrant on its face provided no meaningful guidance which would have allowed the officers executing the warrant to distinguish those items of evidentiary value … from those items with no evidentiary value." *Id*. The warrant did specify that the search was limited to 20 particular boxes of records pertaining to private autopsy files; nonetheless, the *Wecht* court stated that "the Government was possessed of information which, had it been incorporated into the warrant, would have substantially clarified the description of items to be seized so as to focus the executing officers' attention on the actual target of the search." *Id*. at 231. Thus, the court ruled that the descriptions in the warrant were too vague to meaningfully guide the officers' search. *Id*.

A search warrant also must be tailored narrowly to the alleged criminal activity and its duration. *United States v. Ford,* 184 F.3d 566, 574 (6th Cir. 1999). In *Ford*, a business owner was accused of operating an illegal gambling business in connection with a charitable bingo organization. *Id*. The search warrant listed ten clauses of items to be seized. *Id*. While some of these clauses expressly limited the items to those connected with illegal gambling, many did not, and none of the clauses stated a time frame. *Id*. One of the officers who executed the warrant testified that the officers seized "basically most of the documents" at the business location. *Id*. Many of the documents seized related to other businesses owned by the business owner. *Id*. Nonetheless, the court held that "the quoted language authorized a broader search than was reasonable given the facts in the Affidavit supporting the warrant." *Id*. The two main reasons this warrant was held to be overbroad were that

11

it allowed a search of documents unrelated to the illegal bingo business and it did not limit the documents to be searched by dates when such dates were available. *Id*.

Here, the search warrant permitted a search that was broader than the probable cause set forth in the Affidavit of Probable Cause. Attachment A of the warrant simply states the address, the fact that the medical office is located in a one-story building, and that "[t]here are other business establishments located within the building as well." Exhibit C, ¶ 1. Notably, there is no description of the other businesses or how the officers will distinguish between the space occupied by SKS Associates, and the space occupied by said other businesses. Likewise, Attachment A only lists Stephen K. Shaner and Michael Cash, D.O. There is no mention of Dr. Ruth Jones, Dennis Williamson, nor any of the staff at SKS Associates. *Id*.

Attachment B makes blanket statements which allowed the government to indiscriminately seize all documents from the building. *See* Exhibit D. One such section states "Patient information, in any form, whether electronic or non-electronic, files, records and ledgers reflecting any corresponding medical purpose for said prescriptions," without any date limitation. Exhibit D, ¶ 4. The Affidavit provided no basis for believing that any illegality pre-dated the investigation's commencement in August 2016. *See* Exhibit A, ¶ 18. The Affidavit of Probable cause stated, "your affiant believes that Dr. Cash started to write illicit prescriptions for buprenorphine, beginning at least in or about June 1, 2016." *Id*. at ¶ 39. While the affiant does note that it is "reasonable to conclude" that Dr. Cash was "potentially prescribing illicit buprenorphine" before this date, there are no facts to support this claim sufficient to

establish probable cause. *Id*. Nowhere in the warrant is any time frame mentioned to limit the scope of the search to these time frames. Rather, the warrant allowed for the search and seizure of all records kept in the SKS office, despite probable cause relating to practices at SKS only as to August 2016 forward. These records seized, however, go as far back as 2005. Thus, the seizure exceeded the probable cause described in the warrant.

Another section of Attachment B allows the search of "Address and/or telephone books, diaries, phone directories…" Exhibit D, ¶ 7. This language fails to distinguish between records and items tied to SKS or Dr. Cash and those which belonged to other doctors, employees, and businesses operating within the same space. These broad descriptions are also similar to those which have been struck down by courts for lacking particularity. *See, e.g.*, *Stanford v. Texas*, 379 U.S. 476, 486 (1965) (Holding warrant ordering executing officers to search for "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments" failed to meet particularity requirement.); *United States v. Cook*, 657 F.2d 730, 732 (5th Cir. 1981) (Holding warrant authorizing the seizure of "cassettes on to which … copyrighted films … have been electronically transferred and recorded" failed to provide available directions to specify which items were to be seized.); *United States v. Giresi*, 488 F.Supp. 445, 458-459 (D.N.J.1980) (Holding descriptions of "stolen property" and "United States currency" failed to comply with the particularity requirement.).

The lack of particularity in the description of the places and persons to be searched allowed the officers to conduct a general "rummaging around" within the SKS building. The officers seized all documents from the SKS building. Discovery shows documents obtained through discovery include documents relating to the patients of Dr. Ruth Jones, who was not mentioned in the search warrant. The officers also took all of the records of Dennis Williamson, who was employed by Dr. Mary Berge and Associates and rented space within the SKS office. These files were later returned. Finally, records relating to EM2K, a business operated by Dr. Cash which had no relation to SKS or the investigation in this case were also turned over to the defense in discovery.

The officers in this case had enough information to provide more detailed descriptions of the location to be searched and the property to be seized. *See Yusuf*, 461 F.3d at 395. At the time of the search the officers had information from three undercover officers who had each been to the office on several occasions. Absent information from or about other identified patients, the warrant should have been limited to the patient identities which the undercovers used. Further, the undercover agents were on notice as to the other businesses located within the building and the identity of individuals who worked there. The officers also had surveillance footage which showed the activity at the clinic. With this information the officers could have written a detailed particular warrant which contained a time frame for which records should be seized, descriptions of how the officers intended to distinguish the records

of Dr. Cash from those of Dr. Jones, and how the officers could distinguish SKS property from other businesses located within the building.

Much like in *Wecht*, the warrant here provided no meaningful guidance for the officers executing the warrant to distinguish those items of evidentiary value from those items with no evidentiary value. In fact, the warrant in this case is even less particular than the warrant in *Wecht*, as the warrant in that case at least attempted to limit the number and type of files to be searched. Put simply, this warrant allowed the officers executing the warrant, rather than the magistrate who signed the warrant, to determine what items could be searched and seized. The warrant in this case is also similar to the warrant in *Ford* because while the Affidavit of Probable Cause states that the investigation into Dr. Cash began in August 2016, there are no references to this date in the warrant or its attachments. This failure to limit the terms of the warrant by relevant dates when such dates were available renders the warrant overbroad. *See*, *Ford*, 184 F.3d at 576.

The Affidavit of Probable Cause also fails to articulate any reason to search the computers located within the offices of SKS or any particular files located on those computers. Officers took images of several computers located within the SKS offices during their search. Exhibit E, pg. 7. The prosecutors have provided emails from the SKS computers in discovery. These emails come from the email account commonly used by staff at SKS and date back as far as 2015. However, nowhere in the Affidavit of Probable Cause is it alleged that emails from these computers or the computers themselves were used in furtherance of the crimes alleged. Exhibit A. The only

15

mention of emails in the Affidavit of Probable Cause refers to the affiant's knowledge, based on training and experience, that cash based medical offices "sometimes utilize communication features of their telephones such as text messages and email features, to communicate with their patients." Exhibit A, ¶ 4. This paragraph of the Affidavit also states that cash based medical offices commonly store medical records on computer hard drives. *Id*. There is also no allegation in the Affidavit that the Source of Information ("SOI") had any communications with SKS via email. In fact, the only mention of method of communication with the SOI by SKS was a phone conversation. Exhibit A, ¶ 19.

SKS did not keep any medical records in electronic form and the affidavit did not allege to the contrary. There is also no reference in the Affidavit to any of the undercover officers having any email communications with SKS. The undercover officers would have observed SKS employees making notes in physical files. The undercover officers also filled out paper forms every time they visited the office. Exhibit A, ¶¶ 23, 25. In other words, the undercover officers would have had knowledge that SKS used physical, not electronic medical files. Blanket assertions in the Affidavit that the affiant's training and experience led to the conclusion that electronic records were used are not sufficient to support probable cause. *See, e.g.*, *United States v. Loy*, 191 F.3d 360, 366 (3d Cir. 1999) (experience and expertise, without more, is insufficient to establish probable cause); *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) ("rambling boilerplate recitations designed to meet all law enforcement needs" failed to establish probable cause). Rather, the officers should

use the particular facts observed during their investigation to particularly describe documentation for which they had probable cause to believe contained evidence of criminal activity. *See Yusuf*, 461 F.3d at 395.

### Conclusion

Without any limitations in the warrant as to date, business, nor identity of treating doctor, the warrant is overbroad insofar as it allowed officers to search and seize the property of Dr. Jones, Dennis Williamson, any records from before June 1, 2016, and any electronic records. Therefore, all evidence relating to (a) any patient files other than those of the three undercover agents, (b) any property seized related to Dr. Jones or Dennis Williamson, and (c) any electronic files recovered from SKS computers, should be suppressed.

Respectfully submitted,

Dated:  September 6, 2019

*/s/ Thomas J. Farrell*
Thomas J. Farrell, Esquire
PA I.D. No. 48976
FARRELL REISINGER & COMBER, LLC
300 Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219-1827
(412) 894-1380
(412) 894-1381 (facsimile)
tfarrell@farrellreisinger.com

17

_/s/ Matthew B. Goddard_
Matthew B. Goddard, Esquire
Pa. ID No. 325826
Farrell Reisinger & Comber, LLC
300 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 894-1380
mgoddard@farrellreisinger.com

_Attorneys for Defendant, Stephen K. Shaner_